**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

INDEPENDENT LIVING CENTER OF
SOUTHERN CALIFORNIA, INC., a
nonprofit corporation; GRAY
PANTHER SOF SACRAMENTO, a
nonprofit corporation; GRAY
PANTHERS OF SAN FRANCISCO, a
nonprofit corporation; GERALD
SHAPIRO, Pharm. D. doing business
as Uptown Pharmacy and Gift
Shoppe; SHARON STEEN doing
business as Central Pharmacy;
MARK BECKWITH; MARGARET
DOWLING; TRAN PHARMACY, INC.,
doing business as Tran Pharmacy;
JASON YOUNG,
              *Petitioners-Appellees,*

SACRAMENTO FAMILY MEDICAL
CLINICS, INC.; THEODORE MAZER
M.D.; RONALD B. MEAD; ACACIA
ADULT DAY SERVICES,
              *Interveners-Appellees,*

            v.

DAVID MAXWELL-JOLLY, Director of
the Department of Health Care
Services, State of California,
             *Respondent-Appellant.*

No. 08-56422

D.C. No.
2:08-cv-03315-CAS-
MAN

INDEPENDENT LIVING CENTER OF
SOUTHERN CALIFORNIA, INC., a
nonprofit corporation; GRAY
PANTHERS OF SACRAMENTO, a
nonprofit corporation; GRAY
PANTHERS OF SAN FRANCISCO, a
nonprofit corporation; GERALD
SHAPIRO, Pharm. D. doing business
as Uptown Pharmacy and Gift
Shoppe; SHARON STEEN doing
business as Central Pharmacy;
MARK BECKWITH; MARGARET
DOWLING; TRAN PHARMACY, INC.,
doing business as Tran Pharmacy;
JASON YOUNG
            *Petitioners-Appellants,*

SACRAMENTO FAMILY MEDICAL
CLINICS, INC.; THEODORE MAZER
M.D.; RONALD B. MEAD; ACACIA
ADULT DAY SERVICES,
                    *Interveners,*

                v.

DAVID MAXWELL-JOLLY, Director of
the Department of Health Care
Services, State of California,
                    *Respondent-Appellee.*

No. 08-56554

D.C. No.
2:08-cv-03315-CAS-
MAN

OPINION

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted
February 18, 2009—San Francisco, California

Filed July 9, 2009

Before: Stephen Reinhardt, William A. Fletcher, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

## COUNSEL

Richard T. Waldow and Jennifer M. Kim, Supervising Deputy Attorneys General, Carmen D. Snuggs, Tara L. Newman, Andrew Dhadwal, and Sara Ugaz, Deputy Attorneys General, Office of the Attorney General of the State of California, Los Angeles, California, for respondent-appellant/appellee David Maxwell-Jolly, Director of the Department of Health Care Services for the State of California.

Lynn S. Carman, Medicaid Defense Fund, Novato, California, and Stanley L. Friedman, Los Angeles, California, for appellees-appellees/appellants Independent Living Center of Southern California, et al.

Craig J. Cannizzo, Felicia Y. Sze, Hooper, Lundy & Bookman, Inc., San Francisco, California, and Lloyd A. Bookman, Byron J. Gross, Jordan B. Reveille, Hooper, Lundy & Bookman, Inc., Los Angeles, California, for interveners Sacramento Family Medical Clinics, Inc. et al.

William A. Gould, Jr., Kevin C. Khasigian, Wilke, Floury, Hoffelt, Gould & Birney, LLP, Sacramento, California, for Amicus Curiae California Optometric Association.

Rochelle Bobroff and Harper Jean Tobin, Washington, DC, for Amicus Curiae National Senior Citizens' Law Center.

Jane Perkins, Chapel Hill, North Carolina, for Amicus Curiae National Health Law Program, Inc.

Barbara A. Jones, Pasadena, California, for Amicus Curiae AARP Foundation Litigation.

---

## OPINION

MILAN D. SMITH, JR., Circuit Judge:

Petitioners-Appellees/Appellants (Independent Living), a group of pharmacies, health care providers, senior citizens' groups, and beneficiaries of the State's Medicaid program, Medi-Cal,[1] seek to enjoin the California Department of Health Care Services (Department) Director, David Maxwell-Jolly (Director)[2] from implementing state legislation reducing payments to certain medical service providers under Medi-Cal by ten percent. We hold that the district court did not abuse its discretion in granting Independent Living's motion for a preliminary injunction, because the Director failed to "rely on responsible cost studies, its own and others," *Orthopaedic Hosp. v. Belshe*, 103 F. 3d 1491, 1496 (9th Cir. 1997), in determining the effect of the rate cuts mandated by AB 5 on the statutory factors of efficiency, economy, quality, and access to care before implementing those cuts. We also hold that the district court's preliminary injunction should be modified to cover payments for medical services provided on or after July 1, 2008, because the Director waived the State's sovereign immunity in both state and federal court.

---

[1]For simplicity, we attribute to Independent Living generally the collective arguments of Independent Living, Interveners, and Amicus Curiae supporting Independent Living.

[2]Sandra Shewry served as the Department's director when this suit was filed and held that position until April 9, 2009, when she was replaced by Mr. Maxwell-Jolly. Because the distinction between the two directors is irrelevant for the purposes of this case, we use the term "Director" to refer to them both.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 16, 2008, the California Assembly passed AB 5, which added §§ 14105.19 and 14166.245 to the California Welfare and Institutions Code. Section 14105.19 reduces payments under the Medi-Cal fee-for-service program to physicians, dentists, pharmacies, adult health care centers, clinics, health systems, and other providers by ten percent. Section 14166.245 similarly reduces payments for inpatient services provided by acute care hospitals not under contract with the State by ten percent. Both of these rate reductions were scheduled to take effect on July 1, 2008.

On April 22, 2008, Independent Living filed a verified petition for a writ of mandamus in Los Angeles County Superior Court, seeking to enjoin the Director from implementing AB 5.[3] Independent Living argued that the ten percent rate reduction violates Title XIX of the federal Social Security Act (the Medicaid Act), 42 U.S.C. § 1396 *et seq.*, and is therefore invalid under the Supremacy Clause.[4] Specifically, Independent Living alleged that AB 5 is inconsistent with 42 U.S.C. § 1396(a)(30)(A) (hereafter§ 30(A)), which requires that a state plan

> provide such methods and procedures relating to the utilization of, and payment for, care and services available under the plan . . . as may be necessary . . . to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the

---

[3]Independent Living voluntarily dismissed the Department from suit on June 1, 2008, leaving the Director as the sole Respondent.

[4]Independent Living also alleged in their complaint that the ten-percent rate reduction both violated and was preempted by the Americans with Disabilities Act of 1990, 42 U.S.C. § 12181 *et seq.* Independent Living dismissed these claims without prejudice, and they are not before us.

> extent that such care and services are available to the
> general population in the geographic area.

On May 19, 2008, the Director removed this action to federal court based on federal question jurisdiction. On May 30, 2008, Independent Living filed a motion for a preliminary injunction. The district court heard argument on June 23, 2008. Two days later, the court entered an order denying the motion, holding that Independent Living had not demonstrated a likelihood of success on the merits of their preemption claim because § 30(A) did not create any judicially enforceable "rights."

Independent Living then sought emergency relief from this court. After full briefing and argument, we vacated the district court's order, holding that Independent Living could bring suit directly under the Supremacy Clause to enjoin a state law allegedly preempted by federal law. *See Indep. Living Ctr. v. Shewry*, 543 F.3d 1050 (9th Cir. 2008). We remanded to the district court for reconsideration of Independent Living's motion for a preliminary injunction.

On remand, the district court issued an order granting in part and denying in part Independent Living's motion for a preliminary injunction. The district court held that Independent Living had demonstrated a likelihood of success on the merits of its Supremacy Clause claim, as the Director failed to provide any evidence that the Department had considered the impact of the ten percent rate reduction on quality and access to care, as required by § 30(A). The court also held that Independent Living had demonstrated a risk of irreparable injury as to some—but not all—of the challenged Medi-Cal services. The district court thus granted the motion "to the extent that it seeks to enjoin enforcement of Cal. Welf. & Inst. Code § 14105.19(b)(1), which reduces by ten percent payments under the Medi-Cal fee-for-service program for physicians, dentists, pharmacies, adult day health care centers, clinics, health systems, and other providers for services pro-

vided on or after July 1, 2008." The court denied the motion to enjoin enforcement of the rate reductions for managed care plans and non-contract acute care hospitals, as Independent Living had not shown a risk of irreparable injury as to those services.

On August 27, 2008, the Director filed a motion "to alter or amend, and clarify" the August 18 order. The Director argued that the injunction should apply only to payments for services provided on or after August 18, because requiring full reimbursement for services provided prior to the court's order would violate the State's Eleventh Amendment sovereign immunity. The Director also argued that the order was vague and ambiguous and that the Ninth Circuit had yet to rule on the Director's petition for rehearing and rehearing en banc regarding the Supremacy Clause right of action issue.[5] The district court granted the motion in part the same day, issuing an order in chambers modifying the preliminary injunction to apply only to payments "for services provided on or after August 18, 2008." Although the order itself did not provide any explanation for the modification, the district court later stated that it was its "intention only to issue an order that would provide for prospective relief," and that it agreed with the Director "that the order as it was phrased violates the Eleventh Amendment." The district court also indicated that it would not grant the Director's request for a stay and that Independent Living's request for a contempt citation was premature.[6] The district court did not afford Independent Living an

---

[5]The Director's Petition for Panel Rehearing and Petition for Rehearing En Banc was denied on November 3, 2008. On June 22, 2009, the Supreme Court of the United States denied the Director's Petition for Writ of Certiorari.

[6]On September 15, 2008, pursuant to the Director's motion to alter or amend, the district court further modified its August 18, 2008 order to clarify that the order regarding pharmacies applied only to the relief sought, i.e., to rates for prescription drugs, including previously prescription-only prescribed over-the-counter drugs. The district court further struck "health systems, and other providers" from the order. Finally, the district court clarified that the order did not apply to payments for hospitals, including payments for inpatient services, outpatient services, distinct part nursing facility services, and sub-acute services.

opportunity to respond to the Director's argument before issuing its order.

The August 18 order, as modified, generated three appeals, two of which remain before us. In case number 08-56422, the Director appeals the district court's decision to grant the motion for preliminary injunction in part, arguing primarily that the analysis of AB 5 conducted by the Department was legally sufficient and Independent Living therefore cannot demonstrate a likelihood of success on the merits.[7] In case number 08-56554, Independent Living appeals the district court's August 27 order modifying the injunction to apply only to payments for services provided on or after August 18, arguing that the earlier order—which would have granted relief for services provided on or after July 1—did not violate the State's sovereign immunity.[8] We address these arguments in turn.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1292(a)(1). We review a district court's decision to grant or deny a preliminary injunction for abuse of discretion. *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003). "[A] district court abuses its discretion by basing its decision on either an erroneous legal standard or clearly erroneous factual findings." *Walczak v. EPL Prolong,*

---

[7]The Director also argues that Independent Living's claim is not cognizable under the Supremacy Clause. Because we have already ruled on that issue and the court has denied the Director's petition for rehearing/rehearing en banc, the issue is now moot.

[8]Independent Living also initially appealed the district court's denial of their motion to enjoin the Department from reducing payments to Medi-Cal managed care plans by the "actuarial equivalent" of ten percent. *See* Case 08-56551. After filing their notice of appeal, Independent Living dismissed the claim underlying their appeal in district court. We granted Independent Living's motion for dismissal without prejudice in case 08-56551 on January 30, 2009.

*Inc.*, 198 F.3d 725, 730 (9th Cir. 1999). "The district court's interpretation of the underlying legal principles . . . is subject to de novo review," *Sw. Voter Registration*, 344 F.3d at 918, but its factual findings are reviewed for clear error, *Walczak*, 198 F.3d at 730. Factual findings are clearly erroneous "if the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (internal citation omitted).

To warrant injunctive relief, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 129 S. Ct. 365, 374 (2008); *see also Am. Trucking Ass'ns v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.' " *Winter*, 129 S. Ct. at 376 (quoting *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 542 (1987)).

## DISCUSSION

### I. Independent Living's Likelihood of Success on the Merits

**[1]** This is not the first time that we have interpreted the substantive and procedural requirements of § 30(A). In *Orthopaedic Hospital v. Belshe*, 103 F.3d 1491 (9th Cir. 1997), several hospitals and health care associations alleged that the Department violated § 30(A) by setting provider reimbursement rates "without proper consideration of the effect of hospital costs on the relevant statutory factors [of] efficiency, economy, quality of care, and access." *Id.* at 1492. We interpreted § 30(A) to require the Director to set reimbursement rates that "bear a reasonable relationship to efficient and economical hospitals' costs of providing quality services, unless

the Department shows some justification for rates that substantially deviate from such costs." *Id.* at 1496. To meet this statutory requirement, we held that the Director "must rely on responsible cost studies, its own or others', that provide reliable data as a basis for its rate setting." *Id.*

Under the standards established in *Orthopaedic Hospital*, it is clear that the Director violated § 30(A) when he implemented the rate reductions mandated by AB 5. The Director failed to provide any evidence that the Department or the legislature studied the impact of the ten percent rate reduction on the statutory factors of efficiency, economy, quality, and access to care prior to enacting AB 5, nor did he demonstrate that the Department considered reliable cost studies when adjusting its reimbursement rates. Several of the declarations submitted by the Director candidly admit that the Department does not maintain information on provider costs for covered services.[9] *See, e.g.*, Declaration of Linda Machado at 5 ("[T]here is no established mechanism for obtaining cost data from physicians on the costs they incur for providing each of these [covered] services. Therefore, [the Department] has no data from which it can determine how well Medi-Cal rates

---

[9]Moreover, almost all of the declarations provided by the Director rely on past studies, prepared long before AB 5 was contemplated, that simply compiled average provider costs and reimbursement rates without assessing how a ten percent rate reduction might affect the statutory factors of efficiency, economy, quality, and access to care. *See, e.g.*, Declaration of Linda Machado at 1-7 & exs. A & B (discussing various studies from 1997, 1999, and 2000, but not a single study prepared in anticipation of AB 5); Declaration of Jon Chin at 1-6 & ex. B (relying on a DHS report prepared in November 2005); Declaration of Kevin Gorospe at 1-4 (relying almost exclusively on a December 2007 study of pharmaceutical costs prepared by Myers & Stauffer); Declaration of Kevin Gorospe at 1-8 (relying on studies from 2004 and 2007). The district court was well within its discretion in concluding that such *post hoc* rationalizations fall short of the procedural requirements established in *Orthopaedic Hospital*. *See Ark. Med. Soc'y v. Reynolds*, 6 F.3d 519, 530 (8th Cir. 1993) (refusing to rely on speculative evidence that could "only be confirmed by historical data accumulated after the cuts were made").

compensate physician costs."); *id.* at 3 (admitting same lack of cost data for hospital outpatient services); Declaration of Jon Chin at 2 ("DHCS has no available cost data [on covered] dental procedures"). In the absence of such cost data, the Director could not have complied with § 30(A) as interpreted in *Orthopaedic Hospital*.

Perhaps as a result, the Director's primary argument on appeal is that the standards established in *Orthopaedic Hospital* are inapplicable, for several reasons. We address each of them.

## A.  Action Under the Supremacy Clause

[2] First, the Director argues that *Orthopaedic Hospital* is inapplicable because the plaintiffs in that case were not asserting a claim of federal preemption directly under the Supremacy Clause. As the Director notes, *Orthopaedic Hospital* addressed claims brought to enforce the provisions of § 30(A) under 42 U.S.C. § 1983, which provides a remedy for deprivation of any "rights . . . secured by the Constitution and laws" of the United States.[10] *See Orthopaedic Hosp.*, 103 F.3d at 1495. In this case, by contrast, Independent Living does not seek direct enforcement of any "rights" created by § 30(A), but rather argues that the ten percent rate reduction conflicts with the federal requirements established in § 30(A). The question is whether this difference in the theory of recovery renders *Orthopaedic Hospital*'s interpretation of § 30(A) any less persuasive. To answer this question, we turn to basic principles of conflict preemption.

[3] Conflict preemption arises "when compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment

---

[10]*Orthopaedic Hospital* preceded our subsequent decision in *Sanchez v. Johnson*, 416 F.3d 1051, 1068 (9th Cir. 2005), which held that § 30(A) does not create any federal "rights" enforceable under § 1983.

and execution of the full purposes and objectives of Congress." *PG&E Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983) (internal quotation marks and citations omitted); *see also Ting v. AT&T*, 319 F.3d 1126, 1136 (9th Cir. 2003). Under this latter strand of so-called "obstruction" preemption, "an aberrant or hostile state rule is preempted to the extent it actually interferes with the 'methods by which the federal statute was designed to reach [its] goal.' " *Id.* at 1137 (alteration in original) (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987)). "Thus, obstruction preemption focuses on both the objective of the federal law and the method chosen by Congress to effectuate that objective, taking into account the law's text, application, history, and interpretation." *Id.*

**[4]** As the description above makes clear, the first step in any conflict preemption analysis is to determine the purpose of the federal law at issue. *See id.* at 1138. *Orthopaedic Hospital* discussed the purpose underlying § 30(A) at length, reading its text and legislative history as demonstrating that "Congress intended payments to be flexible within a range; payments should be no higher than what is required to provide efficient and economical care, but still high enough to provide for quality care and to ensure access to services." 103 F.3d at 1497. We held that the Department could not accomplish this purpose in the absence of some determination of "what it costs an efficient hospital economically to provide quality care." *Id.* at 1498. Thus, while the Department "need not follow a rigid formula of payments equal to an efficiently and economically operated hospital's costs regardless of other factors," § 30(A) required the Department to at least ascertain provider costs when it adjusted reimbursement rates. *Id.*

**[5]** The Director has not provided any coherent reason why the purpose underlying § 30(A) would be different for purposes of federal preemption than it was for direct enforcement under § 1983, and we see none. That Independent Living in this case has proceeded under a different cause of action than

the plaintiffs in *Orthopaedic Hospital* is therefore an inconsequential distinction. In both cases, the central question is the purpose underlying § 30(A), and as to that question, *Orthopaedic Hospital* clearly controls.

## B. Continuing Validity of *Orthopaedic Hospital*

Second, the Director argues that our more recent decision in *Sanchez*, 416 F.3d 1051, "effectively overruled" *Orthopaedic Hospital*, and that the district court's analysis of the merits was thus based on legal error. This argument is unavailing. *Sanchez* did not overrule *Orthopaedic Hospital*'s interpretation of § 30(A).

**[6]** *Sanchez* addressed the narrow question of "whether developmentally disabled recipients of Medicaid funds and their service providers have a private right of action against state officials to compel the enforcement of a federal law governing state disbursement of such funds." 416 F.3d at 1053. Applying the Supreme Court's decision in *Gonzaga University v. Doe*, 536 U.S. 273 (2002), we held that § 30(A) does not create any federal "rights" enforceable under § 1983. *Sanchez*, 416 F.3d at 1068. In so holding, we did not reach the substantive requirements of § 30(A), as we were concerned solely with whether the plaintiffs in that case could bring suit in federal court. In fact, *Sanchez* does not explore the congressional "purpose" underlying § 30(A), the touchstone of federal preemption analysis. If the *Sanchez* court had any qualms about *Orthopaedic Hospital*'s substantive interpretation of § 30(A), it did not say so.

**[7]** More fundamentally, *Sanchez* cannot be read to have overruled *Orthopaedic Hospital*, for three reasons. First, *Sanchez* does not even cite *Orthopaedic Hospital*, much less overrule its holdings. Second, *Sanchez* was decided by a three-judge panel that, under our circuit rules, was powerless to overturn one of our prior decisions in the absence of intervening authority, *Hart v. Massanari*, 266 F.3d 1155, 1171

(9th Cir. 2001). Third, we affirmed the "continuing vitality" of *Orthopaedic Hospital* in a published opinion filed one month after *Sanchez. See Alaska Dep't of Health & Soc. Servs. v. Ctrs. for Medicare & Medicaid Servs.*, 424 F.3d 931, 940 (9th Cir. 2005). In that case, the State argued—much as the Director has here—that subsequent developments rendered *Orthopaedic Hospital* anachronistic. *See id.* We were "not persuaded," and we noted that "the relevant language of § 30(A) remains unchanged since *Orthopaedic Hospital*, and thus our interpretation of its purpose, and the State's obligations thereunder, still holds." *Id.* at 940-41.

Aside from his misreading of *Sanchez*, the Director also argues that *Orthopaedic Hospital* is no longer good law because its interpretation of § 30(A) "conflicts with the interpretation of the federal agency that Congress vested with authority to enforce and implement" the statute. By this, the Director apparently means that *Orthopaedic Hospital* conflicts with the interpretation of § 30(A) presented in an amicus brief filed by the Solicitor General when the Supreme Court asked him to opine on whether our decision in *Orthopaedic Hospital* was worthy of a grant of certiorari. In the process of recommending denial of certiorari, the Solicitor General opined that requiring states to reimburse medical providers at rates roughly equal to their costs ran counter to the text and legislative history of § 30(A). From this, the Director concludes that a "federal agency" repudiated our interpretation of § 30(A).

**[8]** Whatever the merits of the Solicitor General's views, we owe them no deference in this case. Although at one time the Supreme Court suggested that a legal opinion expressed by an agency in the course of litigation may be entitled to deference, *Auer v. Robbins*, 519 U.S. 452, 461-63 (1997), it subsequently limited such deference to an agency's interpretation of ambiguities in its own regulations, *Christensen v. Harris County*, 529 U.S. 576, 586-88 (2000).

**[9]** The Director also contends that our holding in *Orthopaedic Hospital* has been undermined by Congress's subsequent repeal of the so-called "Boren Amendment," which required states to set hospital inpatient reimbursement rates that were "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." This argument is not persuasive either, as *Orthopaedic Hospital* itself expressly distinguished the requirements of the Boren Amendment, previously codified at § 1396a(a)(13)(A), from the "more flexible" requirements of § 30(A). *See* 103 F.3d at 1499. The fact that Congress repealed the more rigid requirements of the Boren Amendment does not speak to the propriety of our past interpretation of § 30(A). Moreover, we have previously rejected the same argument made by the Director in this case, noting that the repeal of the Boren Amendment, "like its enactment, modified § 13(A) alone; it effected no change to § 30(A)."[11] *Alaska DHSS*, 424 F.3d at 941.

Finally, the Director urges us to reconsider our interpretation of § 30(A) in *Orthopaedic Hospital*, noting that several courts have disagreed with its reasoning. *See, e.g.*, *Rite Aid v. Houstoun*, 171 F.3d 842, 851 (3d Cir. 1999) (holding that "section 30(A) requires the state to achieve a certain result but does not impose any particular method or process for getting

[11]The Director also attempts to graft past judicial interpretation of the Boren Amendment onto this court's interpretation of § 30(A). The Director argues that because (1) *Orthopaedic Hospital* described § 30(A)'s requirements as "more flexible" than the Boren Amendment, and (2) courts held that rates covering only 85-95% of provider costs were reasonable under the Boren Amendment, then (3) reimbursement rates within the same "range of reasonableness" must easily meet the requirements of § 30(A). *See* Reply Brief 08-56422 at 10-11. This argument is a non-sequitur, as *Orthopaedic Hospital* described the *procedural* requirements of § 30(A) as "more flexible" than those of the Boren Amendment, which required "periodic cost reports from hospitals subject to audit by the Department." *See* 103 F.3d at 1499. While § 30(A) requires less formalized procedures than the Boren Amendment, it does not follow that § 30(A)'s substantive requirements are also less demanding.

*to* that result," expressly disagreeing with *Orthopaedic Hospital*); *Methodist Hosps., Inc. v. Sullivan*, 91 F.3d 1026, 1029-30 (7th Cir. 1996) (holding that "[n]othing in the language of § 1396a(a)(30) . . . requires a state to conduct studies in advance of every modification," as the statute merely "requires each state to produce a *result*"). *But see Ark. Med. Soc'y*, 6 F.3d at 530 (holding that § 30(A) requires the state to "consider the relevant factors of equal access, efficiency, economy, and quality of care as designated in the statute when setting reimbursement rates"); *Minn. Homecare Ass'n v. Gomez*, 108 F.3d 917, 918 (8th Cir. 1997) (holding that Medicaid Act "mandates consideration of the equal access factors of efficiency, economy, quality of care and access to services in the process of setting or changing payment rates," although "it does not require the State to utilize any prescribed method of analyzing and considering said factors" and no "formal analysis" is required). Even if we were at liberty to overrule *Orthopaedic Hospital,* we would nonetheless affirm the district court's injunction, for several reasons.

**[10]** First, even those courts that have rejected *Orthopaedic Hospital*'s procedural requirements have generally recognized that state Medicaid rate reductions may not be based solely on state budgetary concerns. *See Rite Aid*, 171 F.3d at 856 ("[B]udgetary considerations may not be the sole basis for a rate revision . . . ."); *see also Beno v. Shalala*, 30 F.3d 1057, 1069 n.30 (9th Cir. 1994); *Amisub (PSL), Inc. v. Colo. Dep't of Soc. Servs.*, 879 F.2d 789, 800-01 (10th Cir. 1989); *Ark. Med. Soc'y*, 6 F.3d at 531 ("Abundant persuasive precedent supports the proposition that budgetary considerations cannot be the conclusive factor in decisions regarding Medicaid."). *But see Am. Soc'y of Consultant Pharmacists v. Garner*, 180 F. Supp. 2d 953, 974-75 (N.D. Ill. 2001). In this case, the record supports the district court's conclusion that "the only reason for imposing the cuts was California's current fiscal emergency." The legislation was passed in an emergency session called to "address[ ] the fiscal emergency declared by the Governor." *See* Declaration of Stan Rosenstein at 1 (describ-

ing the ten percent rate reduction as one option at the State's disposal "for dealing with the fiscal crisis"). Thus, quite apart from any procedural requirements established by *Orthopaedic Hospital*, the State's decision to reduce Medi-Cal reimbursement rates based solely on state budgetary concerns violated federal law.

Second, even if we were in a position to relax the procedural requirements established in *Orthopaedic Hospital*, the Director's failure to study the effect of the rate reduction in any meaningful way would still lead us to enjoin implementation of AB 5. Those courts that have criticized *Orthopaedic Hospital*'s reasoning have not simply rubber-stamped rate reductions imposed by state agencies; rather, reviewing courts typically subject state rate-making to something akin to "arbitrary and capricious" review. *See Rite Aid*, 171 F.3d at 853 (requiring the agency's "process of decision-making" to be "reasonable and sound"); *id.* at 857 (holding that the agency's "11-month period of data gathering, consultation, and review before promulgating the [rate reduction] was not so deficient as to be arbitrary and capricious"); *see also Ark. Med. Soc'y*, 6 F.3d at 529-30 (noting that "[r]eview under the arbitrary and capricious standard" is appropriate).

In this case, the State's own Legislative Analyst warned that the ten percent rate reduction had "the potential to negatively impact the operation of the Medi-Cal Program and the services provided to beneficiaries by limiting access to providers and services," and on that basis recommended that the legislature "reject the Governor's proposal to reduce payments for all providers except hospitals." Nothing in the record indicates that any other State official considered—let alone studied—these possibilities prior to enacting the cuts. Thus, it is far from clear that the Director would prevail under a different standard, as there is no evidence that the agency's decision-making process was "reasonable and sound."[12]

---

[12]The Director urges us to adopt a standard similar to the Third Circuit's "reasonable and sound" decision-making requirement, asserting that he

Third, those courts that have resisted interpreting § 30(A) to include certain procedural requirements have nonetheless held that § 30(A) imposes substantive obligations on states that elect to participate in Medicaid. *See Rite Aid*, 171 F.3d at 851 ("Section 30(A) requires the state to achieve a certain result."); *Methodist Hosps.*, 91 F.3d at 1030 (holding that if rates are inadequate to attract sufficient providers, then "under § 1396a(a)(30), [the state] must raise the price until the market clears"). In this case, Independent Living alleges that at least some medical providers have refused to treat Medi-Cal recipients since the ten percent rate reduction was implemented. *See, e.g.*, Supplemental Declaration of Thu-Hang Tran at 3-5. Even if we were to interpret § 30(A) to mandate a substantive rather than procedural result, the ten percent rate reduction might still conflict with the quality of care and access provisions of § 30(A), as the cuts have apparently forced at least some providers to stop treating Medi-Cal beneficiaries.

The potential difficulties inherent in assessing substantive compliance with the factors laid out in § 30(A) demonstrate

---

was required—at most—to conduct a "reasonably principled analysis" of the rate reductions under *Folden v. Wash. State Dep't of Soc. & Health Servs.*, 981 F.2d 1054, 1057 (9th Cir. 1992). We decline to do so, as Folden pre-dates *Orthopaedic Hospital* and interpreted a separate, now repealed section of the Medicaid Act, § 1396a(a)13(A).

Even if we were to do so, however, we fail to see how adopting Folden's standard would aid the Director in this case. *Folden* held that while "states are left considerable latitude" under the Medicaid Act and are not required to prepare "any special studies or written findings," state agencies must "engage[ ] in a bona fide fact-finding process" and base their rates on those findings. *Id.* Nothing in the record connects the decision to cut Medi-Cal reimbursement rates by ten percent across-the-board to a fact-finding process initiated by state officials. To the contrary, the record quite plainly establishes that rates were cut to respond to the fiscal emergency. Thus, even under *Folden*, the district court did not abuse its discretion in holding that Independent Living was likely to demonstrate that AB 5 frustrates the purpose of § 30(A).

why the more process-oriented view of the statute espoused in *Orthopaedic Hospital* has much to recommend it. As Judge Levi stated in *Clayworth v. Bonta*,

> [*Orthopaedic Hospital*'s] approach has substantial practical benefits. The Medicaid Act is clearly intended to give states discretion and flexibility in setting reimbursement rates, within the limits of federal law. The arbitrary and capricious standard[¹³] limits the court's review of the State's rate setting and permits the court to defer to the judgment of specialists in a complex regulatory field. Furthermore, it is fair to assume that a rate that is set arbitrarily, without reference to the Section 30(A) requirements, is unlikely to meet the equal access and quality requirements.

295 F. Supp. 2d 1110, 1127 (E.D. Cal. 2003), *rev'd*, 140 F. App'x 677 (9th Cir. 2005) (*internal citations omitted*). As Judge Levi recognized, the framework established in *Orthopaedic Hospital* allows reviewing courts to defer to a state agency's balancing of competing interests, so long as the record created by the agency demonstrates that the State considered the factors mandated by statute. In this sense, the procedural approach is far less intrusive than the "substantive compliance" standard espoused by the Third and Seventh Circuits.

[11] In sum, the Director has not demonstrated that *Orthopaedic Hospital* has been overruled or undermined in the past twelve years, and a recent decision of this court expressly

---

¹³Judge Levi traced the roots of *Orthopaedic Hospital*'s procedural requirements to the "arbitrary and capricious" standard of review of agency action. *See* 295 F. Supp. 2d 1126 & n.18. As noted above, other courts have applied the "arbitrary and capricious" standard even after disclaiming the precise procedural requirements established in *Orthopaedic*, which specifically mandates consideration of provider costs.

reaffirmed its central holding. Moreover, even if we were not bound by *Orthopaedic Hospital*, there are compelling reasons to retain *Orthopaedic Hospital*'s process-oriented focus. The district court thus correctly applied binding precedent to Independent Living's claims in this case. Its conclusion that Independent Living had demonstrated a likelihood of success on the merits was not an abuse of discretion.

## II.   Irreparable Harm

**[12]** The Director also argues that the district court committed clear error by holding that Independent Living had demonstrated a likelihood of irreparable harm. The bulk of the Director's argument, however, focuses on the alleged harm to the State in light of its current fiscal crisis.[14] The district court clearly considered the hardship to the State but concluded that any such harm was outweighed by the hardships likely to be suffered by Medi-Cal beneficiaries, who would be forced to go without medical care. We have previously held that it is not legal error to conclude, when balancing "the medical or financial hardship to [Medi-Cal recipients] against the financial hardship to the state," that the balance of hardships "tipped sharply" in favor of the plaintiffs, *see Beltran v. Myers*, 677 F.2d 1317, 1322 (9th Cir. 1982), and we reach the same conclusion in this case.

The Director argues that whatever harm Independent Living will suffer if the injunction is reversed, the State will suffer more harm if the injunction is upheld. To support this argument, the Director cites *Coalition for Economic Equity v. Wilson* for the proposition that the State will be most harmed by losing this appeal. *See* 122 F.3d 718, 719 (9th Cir. 1997) (stating, in dicta, that "it is clear that a state suffers irreparable injury whenever an enactment of its people or their represen-

---

[14]This argument simply reinforces the fact that the driving force behind the rate reduction was the State budget crisis.

tatives is enjoined")); *see also New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (same).

**[13]** As the cited authority suggests, a state may suffer an abstract form of harm whenever one of its acts is enjoined. To the extent that is true, however, it is not dispositive of the balance of harms analysis. If it were, then the rule requiring "balance" of "competing claims of injury," *Winter*, 129 S. Ct. at 376, would be eviscerated. Federal courts instead have the power to enjoin state actions, in part, because those actions sometimes offend *federal* law provisions, which, like state statutes, are themselves "enactment[s] of its people or their representatives," *Coal. for Econ. Equity*, 122 F.3d at 719. Here, Independent Living alleges that allowing AB 5's implementation would violate the Medicaid Act and the Constitution. If we uphold the injunction and interfere with AB 5's implementation, then we will have determined that to do otherwise would permit a violation of a federal law which, like AB 5, was produced by a democratic process. Therefore, in assessing the relative harms to the parties, we reject the Director's suggestion that, merely by enjoining a state legislative act, we create a per se harm trumping all other harms.

**[14]** The Director also challenges the evidence of irreparable injury provided by certain Independent Living entities, taking issue with the gravity of the economic harms alleged by pharmacists and other medical providers. The Director fails to acknowledge, however, that several of the entities are Medi-Cal recipients. This court has previously held that Medi-Cal recipients may demonstrate a risk of irreparable injury by showing that enforcement of a proposed rule "may deny them needed medical care." *Beltran*, 677 F.2d at 1322. In this case, the district court carefully considered the voluminous evidence presented by the parties, concluding that Independent Living had made such a showing with respect to some medical services and failed to do so with respect to others.[15]

---

[15]The district court found that the Independent Living failed to demonstrate irreparable harm as to non-contract hospitals and managed care plans. 2008 WL 3891211, at *9-10. Independent Living does not challenge these findings on appeal.

Aside from restating its own evidence, the Director does not present any specific reason why the district court's weighing of Independent Living's evidence was erroneous. We therefore refuse to disturb the district court's factual findings regarding irreparable injury, which we review for clear error.[16]

## III.    Balance of Equities and the Public Interest

**[15]** Finally, the Director contends that the district court erred in its assessment of the public interest. The public interest analysis for the issuance of a preliminary injunction requires us to consider "whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1458 (Fed. Cir. 1988). The district court held that, although "there is a public interest in ensuring that the State has enough money to meet its financial obligations," this interest was outweighed by the public interest "in ensuring access to health care." The Director argues that, in light of the State budget crisis, the balance of hardships tips in his favor, as the cuts mandated under AB 5 are necessary to help reduce the State budget deficit.

**[16]** We do not doubt the severity of the fiscal challenges facing the State of California. State budgetary concerns cannot, however, be "the conclusive factor in decisions regarding Medicaid." *Ark. Med. Soc'y*, 6 F.3d at 531. A budget crisis does not excuse ongoing violations of federal law, particularly when there are no adequate remedies available other than an injunction. *Ala. Nursing Home Ass'n v. Harris*, 617 F.2d 388, 396 (5th Cir. 1980) ("Inadequate appropriations do not excuse noncompliance."); *see also Beno v. Shalala*, 30 F.3d 1057, 1069 (9th Cir. 1994) (rejecting budget cutting as grounds for waiver of federal AFDC requirements). State budgetary con-

---

[16]Independent Living has not appealed that portion of the district court's order concluding that they failed to demonstrate irreparable injury as to some services. Those findings are therefore not before us.

siderations do not therefore, in social welfare cases, constitute a critical public interest that would be injured by the grant of preliminary relief. In contrast, there is a robust public interest in safeguarding access to health care for those eligible for Medicaid, whom Congress has recognized as "the most needy in the country." *Scweiker v.. Hogan*, 457 U.S. 569, 590, (1982) (quoting H.R. Rep. No. 213 89th Conf. 1st Sess., 66 (1965)). We therefore hold that the district court did not abuse its discretion in concluding that the balance of hardships and the public interest weighed in favor of enjoining implementation of the ten percent rate reduction required by AB 5. *See Beltran*, 677 F.2d at 1322.

## IV.  Sovereign Immunity and the Order Modifying the Injunction

On cross-appeal, Independent Living challenges the district court's August 27, 2008 order modifying its August 18, 2008 order granting Independent Living's motion for a preliminary injunction. Independent Living principally argues that, in modifying the earlier order to eliminate its retroactive effect, the district court misconstrued the extent of the State's sovereign immunity.[17] Independent Living contends that the State of California has consented to actions in state court for retroactive awards of unlawfully withheld funds. Independent Living further maintains that, by removing this case to federal

---

[17]Independent Living also argues that the Director waived the argument that it enjoys sovereign immunity from suit separate from its Eleventh Amendment immunity. It did so, Independent Living maintains, because before the district court, the Director claimed only that it was protected by Eleventh Amendment immunity, not any other form of sovereign immunity. Indeed, sovereign immunity "derives not from the Eleventh Amendment but from the structure of the original Constitution itself." *Alden v. Maine*, 527 U.S. 706, 728 (1999) (citing *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267-268 (1997)). However, the Supreme Court has also noted that the term "Eleventh Amendment Immunity" is "convenient shorthand . . . for the sovereign immunity of the states." *Id.* at 713. We will not penalize the Director for employing an established semantic convention.

court, the Director waived whatever immunity he had in state court. The Director responds that the district court correctly modified the August 18 order. He contends that requiring a state agency to expend state funds based on past conduct violates state sovereign immunity, which, the Director insists, was never waived in either the state or federal forum.

The doctrine of state sovereign immunity generally prohibits damage suits against states in both state and federal court without their consent. The doctrine comes from the Eleventh Amendment, but its essence "derives . . . from the structure of the original Constitution itself." *Alden*, 527 U.S. at 728; *see id.* at 713 (characterizing sovereign immunity as "a fundamental aspect of the sovereignty which the States enjoyed before ratification of the Constitution, and which they retain today").

The Supreme Court has held that state sovereign immunity bars citizens of any state from bringing a lawsuit for damages against a state or state agency. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *see also Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974); *Hans v. Louisiana*, 134 U.S. 1, 10 (1890). However, there are three well-established exceptions to this general rule. Two of them—*Ex parte Young* and state waiver (both explicit consent and implied removal waiver)—are relevant here, and we consider them below.[18]

## A.    The Order's Validity Under *Ex parte Young*

Although the Eleventh Amendment expressly prohibits suits against states in both law and equity, a plaintiff may nonetheless maintain a federal action to compel a state offi-

---

[18]The other exception is that Congress may validly abrogate a state's sovereign immunity through legislation passed pursuant to the Fourteenth Amendment. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976) (holding that Congress may abrogate states' sovereign immunity via legislation enacted pursuant to Fourteenth Amendment).

cial's prospective compliance with the plaintiff's federal rights. *Ex parte Young*, 209 U.S. 123, 156 (1908); *id.* at 160 ("The State has no power to impart to [its officer] any immunity from responsibility to the supreme authority of the United States."); *see also Quern v. Jordan*, 440 U.S. 332, 337 (1979) (citing *Young*, 209 U.S. 123). The court may order such an injunction even if the state's compliance will have an "ancillary effect" on the state treasury. *Edelman*, 415 U.S. at 667-68 (citing *Young*, 209 U.S. 123). This exception applies only to prospective relief; it does not permit retroactive injunctive relief. *Id.* at 668.

In this case, the August 18 order constituted retroactive relief under our controlling precedent. In *Native Village of Noatak v. Blatchford*, we held that, "[i]n requesting an order requiring the Commissioner to perform his 'legal duty' to disburse . . . funds" to him, the plaintiff "essentially seeks an injunction directing the state to pay damages." 38 F.3d 1505, 1512 (9th Cir. 1994). What the plaintiff sought, we held, was "precisely the type of retroactive relief that the Supreme Court refused to allow in *Edelman*," and therefore his "attempt to characterize its claim as one for prospective relief fail[ed] to avoid the bar of the Eleventh Amendment." *Id.*

In this matter, the August 18 order provided retroactive relief that required the State to pay monetary compensation to affected providers.[19] Therefore, under *Native Village of Noatak*, the retroactive portion of that order does not fall under the *Ex parte Young* exception to the sovereign immunity doctrine. As a result, the order violated the State's sover-

---

[19]In so deciding, we employ the approach used by the Second, Fourth, and Seventh Circuits, i.e., whether relief is prospective or retrospective in the Medicaid payment context turns on the date of service, not the date of payment. *See, e.g.*, *New York City Health & Hosps. Corp. v. Perales*, 50 F.3d 129, 137 (2d Cir. 1995); *Wisc. Hosp. Ass'n v. Reivitz*, 820 F.2d 863, 867 (7th Cir. 1987). Therefore, an order enjoining payment reductions for services that had been delivered before August 18 services is retroactive, even if the Department had not yet tendered payment for the services.

eign immunity unless the Director waived that immunity—impliedly through removal, explicitly through consent to suit in state court, or through some combination thereof—an issue we now consider.

## B.    The State's Waiver of Sovereign Immunity

[17] Even if a plaintiff seeks damages for past conduct, sovereign immunity will not insulate a state from suit in state court, provided the state has previously consented to be sued in state court under like circumstances. *See Carey v. Nev. Gaming Control Bd.*, 279 F.3d 873, 877 (9th Cir. 2002). While a state's consent to suit in its own courts does not waive sovereign immunity against suit in federal court, *Carey*, 279 F.3d at 877 (noting that waiver of sovereign immunity "only gives [the state's] consent to suits in its own courts"), a state that consents to suit in state court cannot invoke the sovereign immunity defense after removing the suit to federal court, *Embury v. King*, 361 F.3d 562, 566 (9th Cir. 2004); *Stewart v. North Carolina*, 393 F.3d 484, 488 (4th Cir. 2005). As a result, given that the Director removed the case, sovereign immunity will not protect him if the State has previously consented to suits like this one in state court.

Here, Independent Living points to several state authorities it claims constitute such consent. First, it notes that California Code of Civil Procedure § 1085 provides:

> A writ of mandate may be issued by any court to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station.

Though it does not explicitly waive sovereign immunity against retroactive disbursements, this provision can be read to sanction judicially ordered fund disbursements generally.

California state courts, some interpreting California Code of Civil Procedure § 1085, have condoned such orders in more explicit terms. Various decisions have interpreted state law to permit mandamus actions seeking disbursement of unlawfully withheld funds. *See, e.g.*, *County of L.A. v. Riley*, 128 P.2d 537, 543 (Cal. 1942); *L.A. County v. State Dep't of Pub. Health*, 158 Cal. App. 2d 425, 443 (1958). Notably, some of these cases have specifically recognized the availability of monetary awards against a state agency or official resulting from unlawfully withheld health and welfare payments. *See Mission Reg'l Med. Ctr. v. Shewry*, 168 Cal. App. 4th 460, 480 (Cal. Ct. App. 2008) (citing Code of Civil Procedure § 1085); *Santa Ana Hosp. Med. Ctr. v. Belshi*, 56 Cal. App. 4th 819, 837 (Cal. Ct. App. 1997) (noting that "[a]ctions seeking traditional mandamus to compel a state officer to comply with a mandatory duty to disburse funds do not invade sovereign immunity, even though they involve an incidental monetary award" (citing *of Sacramento v. Lackner*, 97 Cal. App. 3d 576, 587-88 (Cal. Ct. App. 1979))). In *County of Los Angeles v. Riley*, the court authorized back payments for needy services against the State and noted that "[t]he rule is well established in this state that where the action is one simply to compel an officer to perform a duty expressly enjoined upon him by law, it may not be considered a suit against the state." 128 P.2d at 543 (citing, *e.g.*, *Bd. of Dirs. of Woman's Relief Corps Home Ass'n of Cal. v. Nye*, 8 Cal. App. 527 (Cal. Ct. App. 1908)); *see also L.A. County v. State Dep't of Pub. Health*, 158 Cal. App.2d at 442-43; *id.* at 443 (holding that because "the object of the present suits is to compel state officers to disburse funds specifically appropriated for tuberculosis subsidies in the manner provided by the statute," the order involves "no invasion of state sovereignty and does not fall within the rule precluding suits against the state without its consent").

[18] Thus, California has construed the scope of its sovereign immunity as it relates to awards of unlawfully withheld funds more narrowly than have the federal courts. *Compare,*

*e.g.*, *L.A. County*, 158 Cal. App.2d at 442-43 *with Edelman*, 415 U.S. at 668, *and Noatak*, 38 F.3d at 1512. Under California law, an action seeking injunctive relief that requires a state official to disburse funds is not an action against the State. Thus, it does not implicate the State's sovereign immunity against liability in its own courts. Had this action remained in state court, the Director would not have enjoyed sovereign immunity against a order directing payment of retroactive benefits.

**[19]** Under our precedent, because the Director enjoyed no sovereign immunity in state court against a order directing payment of retroactive benefits, it follows that the Director—by removing the case to federal court—waived sovereign immunity in that forum as well. *See Embury*, 361 F.3d at 566 (citing *Lapides v. Board of Regents*, 535 U.S. 613, 623-24 (2002)) (holding that, in removing a case to federal court, a state defendant waives its Eleventh Amendment immunity); *see also Stewart*, 393 F.3d at 488. *Embury*'s rule is grounded on the Supreme Court's holding in *Lapides*, which held that where a state removed a state law defamation action to federal court, it waived its sovereign immunity against the state claim. *Id.* at 624. *Embury* extended *Lapides*'s principle to federal claims.[20] 361 F.3d at 565-66 (citing *Lapides*, 535 U.S. at

---

[20]The Director argues that Lapides and *Embury* should essentially be confined to their facts. Under this reading, the rule applies only where a state has already consented to suit in its own state courts and thus, a state defendant removing a case to federal court takes with it whatever sovereign immunity it had in state court. Other courts have endorsed this narrow view of *Lapides*'s waiver rule. *E.g.*, *Stewart*, 393 F.3d at 488 (stating that *Lapides* "does not resolve whether a state that has not consented to suit in its own courts maintains [immunity] upon voluntarily removing a case to federal court"); *id.* at 490 (construing *Lapides* to mean that in such an instance, a state does not waive sovereign immunity by removal); *see also Watters v. Wash. Metro. Area Transit Auth.*, 295 F.3d 36, 42 n.13 (D.C. Cir. 2002) (noting that "[a]s the [states] have not waived immunity from attorney's liens in their own courts, the narrow holding of *Lapides* does not apply to this case," and the defendant's removal did not waive its sovereign immunity). While our *Embury* holding strongly suggests a broader interpretation of *Lapides*, our conclusion that the Director consented to suit in state court renders the issue moot for the purpose of this case.

620, 623-24). Under *Embury*, the Director, having waived state court immunity, also waived federal court sovereign immunity by voluntarily removing the action. Because the Director lacked sovereign immunity against retroactive orders, the district court's August 18 order should have applied retroactively. As a result, by basing its order on an erroneous legal standard, the district court erred in eliminating the injunction's retroactive effect. We hold that the district court's injunction should extend to all services covered by that injunction and provided on or after July 1, 2008.

## C. Other Claims of Error Regarding the August 27, 2008 Order

Independent Living also contends that the district court's August 27, 2008 order violated their right to due process, namely, their property right in the judgment reflected in the court's August 18, 2008 order. They also allege that, in modifying the August 18 order, the district court abused its discretion under Federal Rule of Civil Procedure 59(e). Based on our conclusion that the August 27, 2008 order erroneously construed the State's sovereign immunity, we do not reach these claims.

## CONCLUSION

The district court properly applied this court's prior decision in *Orthopaedic Hospital* to hold that Independent Living has demonstrated a likelihood of success on the merits. Moreover, the district court did not abuse its discretion in determining that the balance of hardships tips sharply in Independent Living's favor, as the ten percent rate reduction threatens access to much-needed medical care. We therefore affirm the district court's order granting in part Independent Living's motion for a preliminary injunction.

However, the district court's subsequent order modifying the injunction to apply only to payments for services provided

on or after August 18 was based on an erroneous legal standard. The State of California has waived its sovereign immunity against mandamus actions in state courts seeking reimbursement of unlawfully withheld funds, and the Director, by voluntarily removing this case to federal court, waived the State's sovereign immunity in federal court. We therefore reverse the district court's August 18 order modifying the injunction and remand to the district court for further proceedings consistent with this opinion.

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED**.