**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LYDIA DOMINGUEZ, by and through
her mother and next friend Lisa
Brown; ALEX BROWN, by and
through his mother and next friend
Lisa Brown; DONNA BROWN, by and
through her conservator and next
friend Julie Weissman-
Steinbaugh; CHLOE LIPTON, by and
through her conservator and next
friend Julie Weissman-Steinbaugh;
HERBERT M. MEYER, on behalf of
themselves and a class of those
similarly situated; LESLIE GORDON,
on behalf of themselves and a
class of those similarly situated;
CHARLENE AYERS, on behalf of
themselves and a class of those
similarly situated; WILLIE BEATRICE
SHEPPARD, on behalf of themselves
and a class of those similarly
situated; ANDY MARTINEZ, on
behalf of themselves and a class
of those similarly situated; SERVICE
EMPLOYEES INTERNATIONAL UNION
UNITED HEALTH CARE WORKERS
WEST;

SERVICE EMPLOYEES INTERNATIONAL
UNION UNITED LONG-TERM CARE
WORKERS; SERVICE EMPLOYEES
INTERNATIONAL UNION LOCAL 521;
SERVICE EMPLOYEES INTERNATIONAL
UNION CALIFORNIA STATE COUNCIL,
                    *Plaintiffs-Appellees,*

                    v.

ARNOLD SCHWARZENEGGER,
Governor of the State of
California; JOHN A. WAGNER,            No. 09-16359
Director of the California            D.C. No.
Department of Social Services;      4:09-cv-02306-CW
DAVID MAXWELL-JOLLY, Director of       OPINION
the California Department of
Health Care Services; JOHN CHIANG
California State Controller,
                    *Defendants-Appellants,*

                    and

FRESNO COUNTY; FRESNO COUNTY
IN-HOME SUPPORTIVE SERVICES
PUBLIC AUTHORITY,
                    *Defendants.*

Appeal from the United States District Court
for the Northern District of California
Claudia Wilken, District Judge, Presiding

Argued and Submitted
January 19, 2010—Pasadena, California

Filed March 3, 2010

Before: Stephen Reinhardt, William A. Fletcher and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

## COUNSEL

Stephen P. Berzon, Scotta A. Kronland, Stacey M. Leyton, Peder J. Thoreen, and Anne N. Arkush of Altshuler Berzon LLP, San Francisco, California, for the plaintiffs-appellees.

Edmund G. Brown, Jr., Attorney General of California, Douglas N. Press, Senior Assistant Attorney General, Susan M. Carson, Supervising Deputy Attorney General, and Gregory D. Brown and Michael A. Zwibelman, Deputy Attorneys General, San Francisco, California, for the State defendants-appellants.

## OPINION

MILAN D. SMITH, JR., Circuit Judge:

In 1973, the State of California established the In-Home Supportive Services (IHSS) program to provide in-home assistance and care to low-income elderly and disabled persons who otherwise would be unable to remain safely in their homes. *See* Cal. Welf. & Inst. Code § 12300. Plaintiffs-Appellees, a putative class comprised of recipients of the State's IHSS program and the unions who represent IHSS providers, seek to enjoin state legislation that reduces the state contribution to wages paid to IHSS providers because it is preempted by Section 30(A) of the Medicaid Act. The district court issued a preliminary injunction. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Under Title XIX of the Social Security Act (the Medicaid Act), 42 U.S.C. § 1396 *et seq.*, the federal government grants states funds to use towards state-administered programs that provide medical assistance to low income individuals.[1] To receive federal funds, states must administer their programs in compliance with individual "State plans for medical assistance," which require approval by the federal Secretary of Health and Human Services. 42 U.S.C. § 1396-1. The California Department of Health Care Services (Department) is designated the "single State agency established or designated to administer or supervise the administration of the [State] plan." 42 C.F.R. § 431.10(b).

IHSS is one of the programs for which California receives federal funding under its version of Medicaid, known as Medi-Cal. Medi-Cal operates via a prospective reimbursement system, whereby the State "sets reimbursement rates for specific services, regardless of where those services are performed." *Orthopaedic*, 103 F.3d at 1493. IHSS recipients receive a host of "supportive services . . . [,] which make it possible for the recipient to establish and maintain an independent living arrangement." Cal. Welf. & Inst. Code § 12300(b). These services, which are provided in the beneficiary's home, include assistance with ambulation, bathing, oral hygiene, grooming, dressing, bowel and bladder care, feeding, and self-administration of medications. *Id.* § 12300(b)-(d). There are over 360,000 IHSS providers serving 440,000 individuals in California; sixty-two percent of IHSS recipients receive care from an IHSS provider who is

---

[1]For a more detailed discussion of the Medicaid Act, we refer the reader to our prior decisions. *See, e.g.*, *Cal. Pharm. Ass'n v. Maxwell-Jolly*, slip op. at 3331-61 (9th Cir. March 3, 2010) (*California Pharmacists II*); *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644 (9th Cir. 2009) (*Independent Living II*); *Indep. Living Ctr. of S. Cal., Inc. v. Shewry*, 543 F.3d 1050 (9th Cir. 2008) (*Independent Living I*); *Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491 (9th Cir. 1997).

also a relative. In many cases, supportive services are provided by a parent, who is eligible to receive payment for caring for his or her child only upon leaving full-time employment or if the parent is unable to obtain full-time employment because no other suitable provider is available and the child would be left with inadequate care. *See* Cal. Welf. & Inst. Code § 12300(e).

The IHSS program is paid for and administered through a combination of federal, state, and county funds. The State has authorized counties to provide for the delivery of IHSS services by one of two methods: first, a county may hire IHSS providers directly; or second, a county may contract with a nonprofit consortium (NPC) or establish a public authority (PA)—an entity separate from the county that performs public and essential governmental functions necessary to deliver IHSS services. *See* Cal. Welf. & Inst. Code §§ 12302, 12301.6(a)-(b). Fifty-six of the State's fifty-eight counties have established a NPC or PA. NPCs and PAs are considered employers of IHSS providers for purposes of collective bargaining over wages, hours, and other terms and conditions of employment, although IHSS recipients retain the right to hire, fire, and supervise the work of their individual IHSS provider. *Id.* § 12301.6(c).

In counties that have established a NPC or PA, wages and benefits are established through collective bargaining between the NPC or PA and the providers' union. Cal. Welf. & Inst. Code § 12301.6(c). Before any increase in wages or benefits may take effect, it must be approved by the Department, which determines whether the increase is consistent with federal law and ensures that federal financial participation is available. *Id.* § 12306.1(a).

For the IHSS program, the California legislature has directed the Department to establish a provider reimbursement rate methodology that: (1) is consistent with the functions and duties of NPCs and PAs; (2) "[m]akes any

additional expenditure of state general funds subject to appropriation in the annual Budget Act"; and (3) "[p]ermits county-only funds to draw down federal financial participation consistent with federal law." *Id.* § 14132.95(j)(2)(A)(i)-(iii). In establishing its rate-setting methodology, the Department is also authorized to "[d]eem the market rate for like work in each county . . . to be the cap for increases in payment rates for individual practitioner services," and "[p]rovide for consideration of county input concerning the rate necessary to ensure access to services in that county." *Id.* § 14132.95(j)(2)(C).

Following the passage of the American Recovery and Reinvestment Act of 2009 (ARRA), the federal government contributes approximately sixty-two percent of the overall cost of the IHSS program.[2] Of the remaining "non-federal share," the State contributes sixty-five percent while the county contributes thirty-five percent. Cal. Welf. & Inst. Code § 12306(b). However, the State's contribution is subject to a statutory cap. Prior to implementation of the statute at issue in this case, California Welfare & Institutions Code § 12306.1(d)(6) (effective July 1, 2009), the State contributed sixty-five percent of the non-federal share up to $12.10 per hour. *Id.* § 12306.1(c)-(d). That statutory cap has increased over time, beginning at $8.10 per hour in 2000 and reaching $12.10 by way of four statutory increases. *See id.* § 12306.1(d)(1)-(5).

However, on February 20, 2009, the Governor signed § 12306.1(d)(6) into law. Scheduled to take effect July 1, 2009, § 12306.1(d)(6) reduces the statutory maximum for which the State would contribute its proportionate share for IHSS wages and benefits from $12.10 per hour to $10.10 per hour. In other words, the State's maximum contribution to wages and benefits would be reduced from sixty-five percent of the non-federal share of an hourly rate up to $12.10 to

---

[2]Prior to enactment of the ARRA, the federal government contributed fifty percent of the program's costs.

sixty-five percent of the non-federal share of an hourly rate up to $10.10.

The new law does not require counties to reduce wages and benefits paid to IHSS service providers. Counties are permitted to make up the difference between the State's current contribution and any reduction that may result from the State's decreased contribution. Currently, thirty-four of the fifty-six NPCs and PAs pay IHSS providers $10.10 per hour or less in wages and benefits, so there would be no reduction in the State's contribution in any of those counties, including Los Angeles County in which forty-two percent of all IHSS services are provided. Twenty-two counties are, however, directly affected by the rate change. According to Plaintiffs, in response to § 12306.1(d)(6), fourteen of those counties that were paying wages and benefits of more than $10.10 per hour have thus far submitted Rate Change Requests to the Department of Social Services (DSS), seeking to reduce wages effective July 1, 2009.[3] All of these Rate Change Requests were approved by DSS and the Department.

On May 26, 2009, Plaintiffs brought this action challenging § 12306.1(d)(6) under the Supremacy Clause, claiming that in enacting and implementing § 12306.1(d)(6), the State failed to comply with the procedural and substantive requirements of 42 U.S.C. § 1396a(a)(30)(A) (hereafter § 30(A)).[4] After noting that the State conceded that the legislature did not con-

---

[3]On May 1, 2009, DSS issued All-County Information Notice No. I-34-09 notifying counties of § 12306.1(d)(6). The notice instructed: "Counties currently providing wages and individual health benefits above $10.10 must submit a PA Rate Change Request to reflect the change in the maximum amount in which the state will participate. A letter of intent to complete a Rate Change Request must be submitted to [DSS] by June 1, 2009 from each of the counties affected by the statutory change."

[4]Plaintiffs also alleged unlawful discrimination under the Americans with Disabilities Act and Rehabilitation Act. The district court did not address Plaintiffs' ADA or Rehabilitation Act claims and they are not before us on appeal.

sider the § 30(A) factors prior to adopting § 12306.1(d)(6), the district court granted the preliminary injunction. Defendants appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1292(a)(1). A district court's decision to grant or deny a preliminary injunction is reviewed for abuse of discretion. *Indep. Living II*, 572 F.3d at 651. Reviewing for abuse of discretion, first, we "determine de novo whether the trial court identified the correct legal rule to apply to the relief requested." *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc). If the trial court did not identify the correct legal rule, it abused its discretion. *Id.* Second, we must determine if the district court's "application of the correct legal standard was (1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.' " *Id.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 577 (1985)).

In granting a request for a preliminary injunction, a district court abuses its discretion if it "base[s] its decision on an erroneous legal standard or clearly erroneous findings of fact." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1156 (9th Cir. 2006), *abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365 (2008). We review conclusions of law de novo and findings of fact for clear error. *Id.* Under this standard, "[a]s long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *Id.* (internal quotation marks omitted).

## DISCUSSION

**[1]** In seeking a preliminary injunction in a case in which the public interest is involved, Plaintiffs must show that: (1)

they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Cal. Pharms. Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 849 (9th Cir. 2009) (*California Pharmacists I*) (citing *Winter*, 129 S. Ct. at 376); *see also Am. Trucking Ass'ns, Inc. v. City of Los Angeles.*, 559 F.3d 1046, 1052 (9th Cir. 2009).

## I.   Likelihood of Success on the Merits

**[2]** Section 30(A) provides that a State plan must "provide such methods and procedures relating to . . . the payment for . . . care and services . . . as may be necessary . . . to assure that payments are consistent with efficiency, economy, and quality of care." 42 U.S.C. § 1396a(a)(30)(A) (hereafter § 30(A)). In *Orthopaedic*, we held that § 30(A) requires

> the Director [to] set hospital outpatient reimbursement rates that bear a reasonable relationship to efficient and economical hospitals' costs of providing quality services, unless the Department shows some justification for rates that substantially deviate from such costs. To do this, the Department must rely on responsible cost studies, its own or others', that provide reliable data as a basis for its rate setting.

103 F.3d at 1496. The principal issue in this appeal is whether the district court erred in holding that *Orthopaedic* applies to the State's enactment of California Welfare & Institutions Code § 12306.1(d)(6).

**[3]** As we will explain, both the legislature and the Department recognize that reimbursement rates—that is, providers' wages and benefits—are directly correlated to ensuring that services are consistent with efficiency, economy, and quality of care, and sufficient to ensure access to services under the IHSS program. Following passage of § 12306.1(d)(6), coun-

ties, unsurprisingly, reduced the hourly wage paid to IHSS providers. As we explained in *Orthopaedic*, "*payments* for [Medi-Cal] services must be consistent with efficiency, economy, and quality of care, and . . . those *payments* must be sufficient to enlist enough providers to provide access to Medicaid recipients." 103 F.3d at 1496. Because section 12306.1(d)(6) directly affects what Medi-Cal providers are *paid* for providing services, it falls within § 30(A). Thus, we hold that before enacting legislation that has the effect of lowering payments to providers—here, § 12306.1(d)(6)—the State must study the impact of that decision on the statutory factors set forth in § 30(A). *See California Pharmacists II*, slip op. at 3346.

### A. The Application of § 30(A) to Cal. Welf. & Inst. Code § 12306.1(d)(6)

The State argues that *Orthopaedic* does not apply to § 12306.1(d)(6) because that section does not *set* medical reimbursement rates. According to the State, *Orthopaedic* is concerned with ensuring that the State follows adequate procedures to assure that reimbursement rates are consistent with the statutory factors set forth in § 30(A)—efficiency, economy, access, and quality of care. However, § 12306.1(d)(6) neither sets rates, nor changes the procedure in place, i.e., the collective bargaining process, to ensure that wages and benefits paid to IHSS providers are consistent with those statutory factors. Rather, § 12306.1(d)(6) merely lowers the State's *contribution* toward wages and benefits set by the counties pursuant to collective bargaining.

**[4]** We are not persuaded by the State's attempt to distinguish its rate of *reimbursement* to providers from its *contribution* to the amount counties pay providers in the IHSS context. The State claims that it has removed itself from the rate-setting process and left it up to the counties and providers to negotiate rates through collective bargaining. However, by limiting its contribution to its portion of the non-federal share,

the State injects itself *into* the collective bargaining process. Indeed, the statutory cap that the State sets on its contribution provides a powerful bargaining chip to both providers and NPCs or PAs during negotiations over wages and benefits. Prior to § 12306.1(d)(6), providers could seek hourly wages and benefits up to $12.10 knowing that counties would have to contribute just 35 percent of their non-federal share. After the passage of the current § 12306.1(d)(6), providers confront the reality that any hourly wage above $10.10 would be borne entirely by the county.

Similarly, the State argues that the collective bargaining process is an adequate procedure under *Orthopaedic* to assure that rates are consistent with efficiency, economy, and quality of care, and sufficient to ensure access. That may be true, though we note that nothing in the record demonstrates that the Department has conducted any analysis or study regarding the effect of the collectively bargained rates on the statutory factors. But, in any event, Plaintiffs are not challenging those collectively bargained rates, nor are they challenging the collective bargaining process as a method of establishing rates. Rather, they are challenging the procedural adequacy of the legislature's decision to decrease its funding of those rates. As we have explained, decreasing the amount the State contributes to those rates is as integral to the collective bargaining process as the negotiations themselves, because it directly impacts the amount at which rates will ultimately be set.

The record proves the point in this case. Approximately fourteen counties submitted Rate Change Requests after receiving notice of § 12306.1(d)(6). At least two of those Rate Change Requests expressly state that the decision to reduce the hourly wage for IHSS providers "is due to the change in the State Participation Rate, effective July 1, 2009." These changes demonstrate that the amount the State determines it will contribute to IHSS providers' wages and benefits alters the amount counties are willing to pay IHSS providers for their services—something that the State itself recognized as

impacting IHSS recipients' access to services. *See* Cal. Welf. & Inst. Code § 14132.95(j)(2)(C).[5]

The Department itself has acknowledged the relationship between reimbursement rates and access to in-home supportive services. In the State plan, the Department has articulated its policy that "reimbursement rates for Personal Care Services shall not be less than levels necessary to achieve adequate access to these services, but shall not exceed the lesser of specified limits, consistent with the requirements of [§ 30(A)]." The State plan also provides that "[t]o the extent that the Department finds that sufficient access to services is available, any rate *increases* granted under this program shall be no greater than the funds appropriated by the Legislature for such purpose." (emphasis added). The Department has thus recognized that rate increases are subject to the availability of State funds and has expressly conditioned its approval over such increases on a finding that sufficient access to services is otherwise available. The corollary must also be true. That is, the same oversight exists for any decrease in rates brought about by the availability of State funds. The Department is thus well aware that prior to approving reimbursement rates established through collective bargaining, it must determine whether sufficient access to services is available. *Cf. Orthopaedic*, 103 F.3d at 1497 (rejecting the State's argument

---

[5]Indeed, in establishing the IHSS program, the State left the bulk of *administrative* duties to the counties. However, before entrusting the counties to administer the program, the State authorized counties to provide for the delivery of IHSS services by either contracting directly with IHSS providers or by establishing NPCs or PAs that would engage with providers in collective bargaining. *See* Cal. Welf. & Inst. Code § 12301.6(c). The State further directed the Department to establish a provider reimbursement rate methodology that would be consistent with the manner in which NPCs and PAs were constituted. *See id.* § 14132.95(j)(2)(A)(i). In directing the Department to consider a host of relevant factors in establishing its rate-setting methodology, the State recognized that the hourly wage at which providers would be paid would have a direct impact upon "access to services in that county." *Id.* § 14132.95(j)(2)(C).

that it does not have to pay the costs associated with quality of care because hospitals are required to provide such care as a result of contractual obligations and licensing requirements).

Likewise, the Department has recognized the direct link between the State's change in *contribution* rate and the resulting change in *reimbursement* rates. In April 2009, the Department sent the United States Department of Health and Human Services (HHS) an analysis of § 12306.1(d)(6), providing its arguments as to why § 12306.1(d)(6) did not violate newly enacted requirements of ARRA. That analysis explained the reduction in the State's contribution under § 12306.1(d)(6), including that "funding has been reduced so that the maximum wage participation level will be $10.10 per hour starting July 1, 2009. As a result, the State's conditional approvals of the PA rates are no longer effective and each of the counties in question will need to request the State's approval of another PA rate. . . . If in connection with that a county then chooses to negotiate different wages in excess of the $10.10 maximum wage participation level, it will be doing so voluntarily and not because of any State requirements." Thus, the State explicitly invalidated its prior approval of PA rates, previously negotiated via collective bargaining, as a result of § 12306.1(d)(6).

**[5]** In any event, the State's obligation to consider whether providers' "payments are consistent with efficiency, economy, and quality of care," § (30)(A), is independent of whatever wages and benefits are set pursuant to collective bargaining. Notably, in concluding that § 12306.1(d)(6) did not render the State ineligible for increased funding under ARRA, HHS advised the State that if the Department were to approve provider wage rates at a level less than that recommended by the county, "the State would need to assure that the lack of funding from local sources will not result in lowering the amount, duration, scope or quality of care and services available under the plan."

The State argues that there are in excess of 14,000 IHSS providers listed in county registries, implying that there can be no problem with "access" to services following the legislature's decision to cut its contribution to wages and benefits under § 12306.1(d)(6). But the fact that there were 14,000 available IHSS providers in county registries *before* § 12306.1(d)(6)'s rate cut took effect does little to ensure sufficiency of access to quality services after a reduction in wages and benefits. Regardless, as we explained in *Orthopaedic*, "[d]e facto access, produced by factors totally unrelated to reimbursement levels, does not satisfy the requirement of [§ 30(A)]." 103 F.3d at 1498. Sixty-two percent of IHSS recipients receive care from an IHSS provider who is also a relative. Allowing the State to rely on the fact that so many IHSS recipients depend on care from a relative, who may often have no other choice than to provide such services, would allow the State "to ignore the relationship of reimbursement levels to provider costs when determining whether payments are sufficient to ensure access to quality services." *Id.* Moreover, by focusing on quantity of providers, the State fails to consider potential effects on quality of care.

The State's argument also misses the point. "We do not require plaintiffs to show the State has committed a substantive violation of § 30(A)'s access provision when they can show that the State did not comply with § 30(A)'s procedural components." *California Pharmacists II*, slip op. at 3357. Therefore, whether there were to remain an excess of available IHSS providers in county registries after the decrease in wages and benefits has little bearing on the State's procedural compliance with § 30(A). *See Independent Living II*, 572 F.3d at 657 (discussing this court's "process-oriented view" of § 30(A)).

## B.  Consideration of Costs

**[6]** The State next argues that *Orthopaedic* is inapposite to this case because *Orthopaedic* instructs the State to consider

the costs to service providers when its sets reimbursement rates, 103 F.3d at 1496, but providers of IHSS services do not have "costs" that can be reimbursed. Rather, sixty percent of providers are spouses, parents, or other relatives of the beneficiaries, and approximately fifty percent live with the recipients they serve. The State contends that it would thus be "virtually impossible" for it to obtain "cost studies" with respect to IHSS services, and so *Orthopaedic*, which holds that states should consider costs, should not apply.

We rejected a similar argument in *Independent Living II*. There, the Director argued that there was "no established mechanism for obtaining cost data from physicians on the costs they incur for providing each of these [covered] services." 572 F.3d at 652 (brackets in original) (internal quotation marks omitted). Having determined that § 30(A) clearly applied to the State's decision to cut providers' reimbursement rates, we rejected the Director's argument, and held that "[i]n the absence of such cost data, the Director could not have complied with § 30(A)." *Id.* The same holds true here. Since we have determined that the State should have studied the impact of its decreased contribution to providers' wages and benefits prior to passing § 12306.1(d)(6), the State is not *ipso facto* immunized from challenges to its actions because it had no system in place to make such an assessment.

Furthermore, there does not seem to be anything inherently difficult about studying IHSS providers' "costs" since there is undoubtedly a way to measure what it costs providers to care for IHSS recipients. The State argues that it cannot study costs because IHSS providers are providing "only their time and labor" and are not paid "rates for specific services, but rather receive hourly wages and benefits for the work they perform." We disagree. The hourly wage paid to an IHSS provider *is* the rate to which they are entitled for providing specific services. *See* Cal. Welf. & Inst. Code § 14132.95(j)(1) ("[R]eimbursement *rates* for personal care services shall be equal to the *rates* in each county for the same mode of ser-

vices in the [IHSS] program." (emphases added)). Indeed, those services are expressly enumerated in the governing statute. *See id.* § 12300(b).

**[7]** In addition, while the State "need not follow a rigid formula," *Orthopaedic,* 103 F.3d at 1498, for determining what it costs providers to care for IHSS recipients, they must rely on something. The State offers nothing to support its assertion that it would be "nonsensical and virtually impossible" to comply with *Orthopaedic*'s requirements in the IHSS context. To the contrary, the State concedes that the July 2008 Report to the Legislature, Public Authorities and Nonprofit Consortia in the Delivery of In-Home Supportive Services, SFY 2006/2007 (the July 2008 Report) contains extensive data regarding quality and access in the IHSS system, including: the number of providers available to work on provider registries for each county; data on service shortages and the availability of emergency back-up providers; data on PA/NPC rates and IHSS provider wages and benefits by county; data from provider and consumer satisfaction surveys and PA/NPC surveys; as well as what it costs PAs and NPCs to deliver services. In fact, the State argues that the July 2008 Report satisfies § 30(A)'s requirements—a contention to which we turn below. Yet, the State cannot have it both ways: either it is able to comply with § 30(A), or it is not.

At the very least, the State may look to what it costs providers of analogous services, such as in-home nursing care, as a means of considering providers' costs. Indeed, in determining the "cap for increases in payment rates for individual practitioner services," the Department is similarly authorized to look to the market rate for "like work in each county." Cal. Welf. Inst. Code § 14132.95(j)(2)(C)(i).

**[8]** Accordingly, we hold that the district court did not err in holding that § 30(A) applies to the State's enactment of § 12306.1(d)(6).

## C.    State Compliance with § 30(A)

Next, the State argues that while it was under no obligation to do so, it complied with everything that *Orthopaedic* requires by preparing the 2008 Report. The district court did not consider this report because it believed that the State conceded that the legislature did not consider § 30(A) prior to enacting § 12306.1(d)(6).

**[9]** We agree that, at oral argument before the district court, the State conceded that the legislature did not consider any analysis of the § 30(A) factors prior to enacting § 12306.1(d)(6). Not only did the State fail to raise this claim before the district court, thus waiving the issue, *see United States v. Flores-Montano*, 424 F.3d 1044, 1047 (9th Cir. 2005) (issues not raised to the district court are normally deemed waived subject to three "narrow exceptions"), it took the position that any consideration of § 30(A) would be impossible.

**[10]** In any event, the 2008 Report is inadequate for purposes of § 30(A). Nowhere does the 2008 Report contain any references to § 12306.1(d)(6), let alone "study the impact of the contemplated rate change(s) on the statutory factors *prior to* setting rates, or in a manner that allows those studies to have a meaningful impact on rates before they are finalized." *California Pharmacists II*, slip op. at 3360-61. Rather, the 2008 Report is the annual report that DSS is statutorily required to provide the legislature, regarding the efficacy of counties' elections to establish a PA or contract with an NPC to deliver services. *See* Cal. Welf. & Inst. Code § 12301.6(o). While the annual report includes assessments of the quality of care being provided in the IHSS program, it contains no discussion of a contemplated rate change that would either increase or decrease payment rates. Finally, in the report on which the State relies, forty-three percent of PA/NPCs reported a "critical shortage of available providers that affected a specific subpopulation of IHSS consumers." That

conclusion belies the State's assertion that current wages and benefits—those in effect prior to passage of § 12306.1(d)(6) —are consistent with § 30(A)'s statutory factors.

## II. Irreparable Harm

The State next argues that the district court erred in concluding that Plaintiffs established irreparable harm absent injunctive relief. In holding that Plaintiffs made a sufficient showing of irreparable harm, the district court made two factual findings, which we review for clear error. *Earth Island Inst.*, 442 F.3d at 1156. First, the district court held that wage reductions would cause IHSS providers to leave employment, leaving IHSS recipients without IHSS assistance. Second, the district court concluded that IHSS providers would also suffer immediate and irreparable harm, due to the fact that a reduction in providers' wages and benefits would result in financial injury that providers would be unable to recover due to the State's Eleventh Amendment immunity.

[11] On appeal, the State's primary argument is that Plaintiffs failed to submit any credible evidence that a reduction in the State's contribution, resulting in a decrease in wages to IHSS providers, would cause IHSS recipients to go without care. However, the State takes no position on whether Plaintiffs may establish irreparable injury to IHSS *providers* as opposed to IHSS *recipients*. As we stated in *California Pharmacists II*, to show a likelihood of irreparable injury, "plaintiffs need only show harm to Medi-Cal service providers or their members." Slip op. at 3358; *see also California Pharmacists I*, 563 F.3d at 850. Here, Plaintiffs have submitted ample evidence of harm to IHSS providers, including that fourteen counties have sought to reduce wages and benefits in the wake of § 12306.1(d)(6), which would impact many providers' ability to afford such basic necessities as food, clothing, utilities, and rent. Accordingly, we hold that the district court did not abuse its discretion in concluding that Plaintiffs estab-

lished irreparable harm absent injunctive relief, as its finding regarding provider harm was not clearly erroneous.

## III. Balance of Equities and the Public Interest

**[12]** As to the final two elements necessary to obtain a preliminary injunction in a case in which the public interest is involved, we have repeatedly recognized that individuals' interests in sufficient access to health care trump the State's interest in balancing its budget. *See Independent Living II*, 572 F.3d at 659; *California Pharmacists II*, slip op. at 3360. (recognizing the important public interest in social welfare cases of safeguarding access to health care for Medicaid-eligible individuals). We continue to do so here, especially in light of evidence in the record that suggests that reductions in providers' wages and benefits may have an adverse, rather than beneficial, effect on the State's budget, such that it would actually save the State money if it maintained its current level of funding of the IHSS program. *See California Pharmacists I*, 563 F.3d at 852 (balance of equities and public interest weighed in favor of Medi-Cal providers where the impact of the injunction on the State's budget crisis would be minimal).

**[13]** The State argues that if this injunction is upheld, "it will be unclear whether the State may ever undertake any action to reduce its payments" to Medi-Cal service providers. This statement wholly misreads our Medicaid jurisprudence. If the State makes a policy decision to decrease providers' reimbursement rates, and fully complies with the requirements of this and our other decisions, it will not be barred by current federal Medicaid law from doing so. Accordingly, we hold that the district court did not abuse its discretion in concluding that the balance of hardships and the public interest weighed in favor of enjoining implementation of California Welfare & Institutions Code § 12306.1(d)(6).

## CONCLUSION

The district court properly determined that § 30(A) of the Medicaid Act applies to the State's enactment of California

Welfare & Institutions Code § 12306.1(d)(6). The district court correctly held that Plaintiffs demonstrated a likelihood of success on the merits of their Supremacy Clause claim, and did not abuse its discretion in holding that the balance of hardships tips sharply in Plaintiffs' favor. Accordingly, we affirm the district court's order granting the motion for a preliminary injunction.

**AFFIRMED.**